626 P.2d 292
**STATE of New Mexico, Plaintiff-Appellee,**

v.

**Gerson C. CARR, Defendant-Appellant.**

**No. 4376.**

Court of Appeals of New Mexico.

Feb. 19, 1981.

Rehearing Denied March 4, 1981.

Certiorari Denied April 2, 1981.

Steven G. Farber, Santa Fe, for defendant-appellant.

Jeff Bingaman, Atty. Gen., Eric Scott Jeffries, Walter Lombardi, Asst. Attys. Gen., Santa Fe, for plaintiff-appellee.

758

## OPINION

HERNANDEZ, Chief Judge.

Defendant was convicted of forty-two counts under the Controlled Substances Act, §§ 30–31–1 to 30–31–40, N.M.S.A.1978 (1980 Repl.Pamph.). He was found by the jury to be guilty of trafficking in dilaudid, contrary to § 30–31–20, of distributing biphetamine, contrary to § 30–31–22, and of intentionally acquiring or obtaining possession of dilaudid and biphetamine by misrepresentation, fraud, deception, or subterfuge, contrary to §§ 30–31–20 and 30–31–25 of the C.S.A. and § 30–28–2, N.M.S.A.1978 (1980 Cum.Supp.). We affirm.

The issues we address are: I. Whether a physician who writes a prescription for a controlled substance, not in the course of his professional medical practice or research, is "trafficking" or "distributing" under the C.S.A.; II. whether a physician who gives away or sells to a patient a controlled substance, not in the course of his professional medical practice or research, is "trafficking" under the C.S.A.; III. if those activities are proscribed, whether application to the defendant of the statutes under which he was convicted is unconstitutional; IV. whether a physician may be charged with intentionally obtaining a controlled substance by misrepresentation when he writes a prescription not in the course of his professional medical practice or research; V. whether the conspiracy conviction can stand; VI. whether admission of certain evidence constitutes reversible error; VII. whether the grand jury indictments are valid; VIII. whether prosecutor misconduct occurred which denied defendant a fair trial; IX. whether there was error in the jury instructions; X. whether Count II of the indictment gave defendant sufficient notice of the offense charged; and XI. issues of a new trial and cumulative error.

I. The state asserts that a physician who issues prescriptions not in the course of professional medical practice or research is distributing drugs in violation of § 30–31–20 or § 30–31–22. Trafficking is prohibited by § 30–31–20. In pertinent part that statute reads:

A. As used in the Controlled Substances Act, "traffic" means the:

1. manufacture of any controlled substance enumerated in Schedules I through V,

2. distribution, sale, barter or giving away any controlled substance enumerated in Schedules I or II which is a narcotic drug, or

3. * * *

B. Except as authorized by the Controlled Substances Act, it is unlawful for any person to intentionally traffic* * * *

The distribution of drugs is prohibited by § 30–31–22, which reads:

A. Except as authorized by the Controlled Substances Act * * * it is unlawful for any person to intentionally distribute or possess with intent to distribute a controlled substance except a substance enumerated in Schedules I or II which is a narcotic drug* * * *

Dilaudid (hydromorphone), the drug in which defendant was found to have trafficked, is a narcotic drug listed in Schedule II. Section 30–31–7(A)(2)(g), N.M.S.A.1978 (1980 Repl.Pamph.). Biphetamine (amphetamine), the drug he was found to have distributed in violation of § 30–31–22, is a non-narcotic Schedule II substance. Section 30–31–7(A)(3)(a), N.M.S.A.1978 (1980 Repl.Pamph.). The state contends that defendant "distributed" dilaudid and biphetamine when he prescribed them for Niki Jones. The definitions of "distribute" and other relevant terms as used in the C.S.A. are set out below.

"[D]istribute" means to deliver other than by administering or dispensing a controlled substance[.]

Section 30·31–2(J).

"[D]eliver" means the actual, constructive or attempted transfer from one person to another of a controlled substance whether or not there is an agency relationship[.]

Section 30 31 -2(G).

"[A]dminister" means the direct application of a controlled substance by any means to the body of a patient or re-

search subject by a practitioner or his agent[.]

Section 30–31–2(A).

"[D]ispense" means to deliver a controlled substance to an ultimate user or research subject pursuant to a lawful order of a practitioner, including the administering, prescribing, packaging, labeling or compounding necessary to prepare the controlled substance for that delivery[.]

Section 30–31–2(H).

"[D]ispenser", means a practitioner who dispenses* * * *

Section 30–31–2(I).

"[P]ractitioner" means a physician, dentist, veterinarian or other person licensed to prescribe and administer drugs which are subject to the Controlled Substance Act* * * *

Section 30–31–2(S).

Defendant argues that under these definitions "distribute" and "dispense" are exclusive of one another. Consequently a person who dispenses drugs cannot, by the same act, be distributing them. "Dispense" includes the prescribing of a drug by a physician. Unlike the corresponding federal statute, 21 U.S.C. § 841(a)(1) (1976) of the Drug Abuse Prevention and Control Act, 21 U.S.C. §§ 801 *et seq.* (1976), our trafficking statute, § 30–31–20, does not include "dispense" in the list of proscribed activities. In support of his contention that a physician who is prescribing a drug cannot be prosecuted under either the trafficking statute, § 30–31–20, or the distributing statute, § 30–31–22, defendant asserts that the Legislature has established parallel systems of regulating controlled substances. One system, he argues, governed by §§ 30–31–20 through 30–31–23, controls those who sell, deliver, and possess drugs in the street. The other system, found in §§ 30–31–12 through 30–31–19 and § 30–31–24, regulates those permitted by law to conduct transactions in controlled substances.

While some states have found that their statutory schemes embrace two parallel systems of drug enforcement, depending on whether or not the violator is registered to conduct transactions in controlled substances, *State v. Best*, 292 N.C. 294, 233 S.E.2d 544 (1977); *McLean v. State*, 527 S.W.2d 76 (Tenn.1975); *see generally Haney v. State*, 544 S.W.2d 384 (Tex.Crim.App. 1976), other states have found a physician is subject to the same criminal penalties as any drug pusher if he delivers drugs by means of a prescription not written in the course of his professional practice. *People v. Alford*, 73 Mich.App. 604, 251 N.W.2d 314 (1977), *aff'd*, 405 Mich. 570, 275 N.W.2d 484 (1979); *State v. Vaccaro*, 142 N.J.Super. 167, 361 A.2d 47, *cert. denied*, 71 N.J. 518, 366 A.2d 674 (1976); *see State v. Vinson*, 298 So.2d 505 (Fla.Ct.App.1974), *aff'd* 320 So.2d 50 (1975). Federal law has also been interpreted to allow the prosecution of a physician in these circumstances. *United States v. Moore*, 423 U.S. 122, 96 S.Ct. 335, 46 L.Ed.2d 333 (1975), hereinafter *Moore*.

Defendant asserts that a registrant under the Act may be prosecuted only under § 30–31–24, which reads in part:

A. It is unlawful for any person:

(1) who is subject to Sections 30–31–11 through 30–31–19 NMSA 1978 to intentionally distribute or dispense a controlled substance in violation of Section 30–31–18 NMSA 1978;

(2) who is a registrant, to intentionally manufacture a controlled substance not authorized by his registration, or to intentionally distribute or dispense a controlled substance not authorized by his registration to another registrant or other authorized person;

(3) to intentionally refuse or fail to make, keep or furnish any record, notification, order form, statements, invoice or information required under the Controlled Substances Act* * * *

(4) to intentionally refuse any entry into any premises for any inspection authorized by the Controlled Substances Act.

B. Any person who violates this section is guilty of a fourth degree felony and shall be sentenced pursuant to the provisions of Section 31–18–15 NMSA 1978 (1980 Repl.Pamph.).

Section 30–31–18, violation of which by registrants is prohibited under § 30–31–24(A)(1), reads:

A. No controlled substance listed in Schedule II which is a prescription drug as determined by the federal food and drug administration, may be dispensed without a written prescription of a practitioner, unless administered directly to an ultimate user. No prescription for a Schedule II substance may be refilled. No person other than a practitioner shall prescribe or write a prescription.

B. Prescriptions for Schedules II through IV shall contain the following information:

(1) the name and address of the patient for whom the drug is prescribed; and

(2) the name, address and registry number of the person prescribing the drug. The name of the pharmacist and the dispensing date of the drug shall be inscribed on the face of the prescription.

C. A controlled substance included in Schedules III or IV, which is a prescription drug as determined under the New Mexico Drug and Cosmetic Act [26–1-1 to 26–1–26, 26–3–1 to 26–3–3 NMSA 1978], shall not be dispensed without a written or oral prescription of a practitioner, except when administered directly by a practitioner, to an ultimate user. The prescription shall not be filled or refilled more than six months after date of issue or be refilled more than five times, unless renewed by the practitioner and a new prescription is placed in the file. Prescriptions shall be retained in conformity with the regulations of the board.

■ We reject defendant's argument that he may be punished only under § 30–31–24 for the following reasons: A. the overall scheme of the C.S.A. indicates that registrants could be punished under other sections; B. § 30–31–24 generally concerns technical violations with respect to registrants; and C. defendant's interpretation of the Act results in an absurdity.

The C.S.A. is patterned after the Uniform Controlled Substances Act, which is similar to the federal act, 21 U.S.C. §§ 801 et seq. See Uniform Controlled Substances Act: Commissioners Prefatory Note, 9 U.L.A. 188 (1979). In interpreting the New Mexico Act we are guided by Moore, to the extent that our statutes are similar to the federal statutes.

A. The overall scheme of the Act indicates registrants could be punished under other sections of the Act as well as § 30–31–24. First, the trafficking statute makes it unlawful for any person to intentionally traffic. Section 30–31–20(B). In construing a similar statute, 21 U.S.C. § 841(a)(1), the United States Supreme Court noted in Moore that the statute does not say "any person except registrants", which language Congress could have used if it had wished to exclude registrants from the application of the statute. We believe that reasoning applies also to our statute.

Second, § 30-31–20(B) does authorize "trafficking" (i. e. manufacture, distribution, sale, and possession) in certain circumstances. It says: "Except as authorized by the Controlled Substances Act, it is unlawful * * * to intentionally traffic." (Emphasis added.) Authorization is found in § 30–31–12, which requires that every person who "manufactures, distributes or dispenses any controlled substance * * * must obtain annually a registration[.]" Section 30–31--12(A). Registrants "may possess, manufacture, distribute, dispense, prescribe or conduct research with * * * [controlled] substances to the extent authorized by their registration and in conformity with the other provisions of the Controlled Substances Act[.]" Section 30–31–12(B). This latter subsection is similar to 21 U.S.C. § 822(b) which the Court in Moore found not to be a blanket authorization of all acts by registrants, but rather a qualified authorization of certain activities. Similarly, we believe that our statute, § 30–31–12(B), is only a qualified authorization for certain activities of registrants.

Another reason for rejecting defendant's argument that the Legislature has established parallel schemes for handling violations of the C.S.A. is that § 30–31–24, which

defendant says applies to registrants, does not on its face apply only to them. The statute begins, "It is unlawful for *any person\* \* \* \**" (Emphasis added.) Not all the subsections in that statute use the term "registrant" to limit "any person." The use and omission of the term "registrant" was found significant by the United States Supreme Court in *Moore* in examining 21 U.S.C. §§ 842(a) and 843(a), which are in pertinent part similar to our sections 30–31–24(A) and 30–31–25(A), respectively. The Court concluded that the fact that §§ 842 and 843 did not apply exclusively to registrants weakened the argument that Congress had established parallel systems. We adopt that reasoning with respect to our statutes.

B. Sections 30–31–24 and 30–31–25 generally concern technical violations. This is clear both from a perusal of these sections and from a consideration of their penalties. A violation of either section is a fourth degree felony, §§ 30–31–24(B) and 30–31–25(B), whereas a violation of the trafficking statute is a second degree felony for the first offense. Section 30–31–20(B)(1). A comparison of the penalties under the alleged parallel systems is a factor to be considered in determining whether the Legislature did intend to establish parallel systems. In *Moore* the Court noted the less severe penalties under the statutes regulating registrants compared to the harsher penalties under the general statutes indicated that the former statutes covered more or less technical violations. It concluded that Congress had not established parallel systems of drug enforcement under the Federal Act. In *Best*, the Supreme Court of North Carolina noted that the penalties for violations of the general statute and violations of that statute purportedly applying to registrants were essentially the same, and concluded that the statute governing registrants covered more than technical violations. It found parallel systems regulating drug transactions. Under current law in New Mexico, a fourth degree felon is sentenced to eighteen months imprisonment, whereas a second degree felon receives a nine year sentence. Section 31–18–

15(A), N.M.S.A.1978 (1980 Cum.Supp.). Because this difference is so great, we believe that §§ 30–31–24 and 30–31–25 prohibit essentially technical violations. This is a further indication that the Legislature did not intend to establish dual systems of regulating drug transactions depending on the status of the offender.

C. Defendant's interpretation of the Act would result in an absurdity. Under his interpretation, physicians are liable under §§ 30–31–24 and 30–31–18 rather than under the general statutes, §§ 30–31–20 and 30–31–22. If he is correct, a physician who wished to avoid prosecution altogether could deliver drugs indiscriminately to other persons, so long as he delivered them by issuing prescriptions, and his prescriptions conformed to the technical requirements of § 30–31–18. *See* § 30–31–24(A). Only if he made the error of handing out drugs without a prescription would he be subject to criminal liability for violation of § 30–31–18. This statute prohibits the dispensing of most controlled substances without a written prescription, unless administered directly to the ultimate user. Thus a physician who handed out or sold drugs directly could be prosecuted, but one who accomplished the same thing through writing technically legal prescriptions could not. The Legislature could not have intended that its laws could be circumvented so easily. It is not, therefore, reasonable to assume that the Legislature intended physicians to be liable only for violations of § 30–31–24 and immune from prosecution under the general trafficking and distributing statutes. The Legislature did not establish parallel systems—one for registrants under the Controlled Substances Act and another one for everyone else.

Defendant's argument that a dispenser cannot be punished under § 30–31–20, the trafficking statute, or under § 30–31–22, for distributing, because "dispensing" is not prohibited by those statutes, is not persuasive. We agree with defendant that "prescribing" is a method of "dispensing," § 30–31–2(H), but we find that the act of prescribing is more than writing a techni-

cally legal order for a drug. Section 30–31–2(T) defines "prescription" as:

an order given individually for the person for whom is prescribed a controlled substance, either directly from the prescriber to the pharmacist or indirectly by means of a written order signed by the prescriber and in accordance with the Controlled Substances Act or regulations adopted thereto[.]

The Regulations of the New Mexico Board of Pharmacy further specify that:

[a] prescription for a controlled substance, may be *issued only for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice,* and who is registered under the Controlled Substances Act\* \* \* \* (Emphasis added.)

New Mexico Drug Laws and Board of Pharmacy Regulations, Reg.No. 20 § 913(A) (1980). Consequently, a physician is prescribing drugs only when he issues a prescription for a legitimate medical purpose and when acting in the usual course of his professional practice. When he so acts, he is "dispensing" under § 30–31–2(H). A physician who does not issue a prescription under these conditions would not be acting in a manner authorized by the Act.

As further support for the view that the Legislature intended to authorize only prescriptions issued for a legitimate medical purpose by a practitioner acting in the usual course of his professional practice, we note that the words "in the course of his professional practice" are used to limit prescription writing in other statutes of the C.S.A. Section 30–31–23 states:

A. It is unlawful for any person intentionally to possess a controlled substance unless the substance was obtained pursuant to a valid prescription or order of a practitioner *while acting in the course of his professional practice,* or except as otherwise authorized by the Controlled Substances Act\* \* \* \* (Emphasis added.)

This statute would be incongruous in the C.S.A. if the view were adopted that the Act considered *all* prescriptions (as opposed to only those written in the course of professional practice) valid. If all prescriptions were valid, then anyone obtaining a controlled substance pursuant to a prescription should be in lawful possession. Section 30–31–23(A) specifies, however, that every possession pursuant to a prescription is not lawful. A similar argument with respect to the Texas statute was made by the dissent in *Haney.* See *Moore, Alford, supra* (both courts consider the effect of similar statutes in their statutory schemes). Pertaining to records of registrants, § 30–31–16 specifies:

E. A practitioner is not required to keep records of controlled substances listed in Schedules II through V *which he prescribes* or administers *in the lawful course of his professional practice*\* \* \* \* (Emphasis added.)

This provision is similar to 21 U.S.C. § 827(c)(1)(A) which the Court in *Moore* considered as an indication that Congress intended to confine authorized medical practice within accepted limits. We read our statute as an indication that the New Mexico Legislature had a similar intent. The state's view is correct. When a physician writes a prescription not for a legitimate medical purpose nor in the usual course of his professional practice, he is "distributing" drugs. His activity in so doing is not authorized by the C.S.A. and may be a violation of § 30–31–20 or § 30–31–22.

■ II. Count II of the indictment charges the defendant with trafficking in that he gave Niki Jones, not in the course of professional medical practice or research, a bottle of pills which was a Schedule II narcotic drug. The state claims this activity is in violation of § 30–31–20(A)(2), which defines the distribution of a Schedule II narcotic drug as "trafficking." We do not believe the Legislature intended to outlaw the current practice of many physicians who hand out sample medications to their patients for a legitimate medical purpose and in the course of their professional medical practice or research. Such authorized activity would be "dispensing" because it would be delivery of a controlled substance to an ultimate user subject to the lawful

order of a practitioner. Section 30–31–2(H). For reasons similar to those already mentioned, we believe that the Legislature did intend that the C.S.A. would authorize *only* that dispensing by a physician which was done for a legitimate medical purpose and in the course of his professional practice or research. Activity which exceeded these limits would not be dispensing, but unauthorized distributing. The trafficking statute was intended to apply to a physician who gives out drugs for something other than a legitimate medical purpose. Thus, Count II of the indictment properly charged defendant with "trafficking."

III. Defendant argues that application to him of the trafficking and distributing sections is an unconstitutional contravention of the Fifth and Fourteenth Amendments to the United States Constitution and of Article II, § 18 of the New Mexico Constitution. We disagree.

▪ A penal statute or regulation which either forbids or requires the doing of an act in terms so vague that men of common intelligence must guess at its meaning and differ as to its application lacks the first essential of due process of law. *Connally v. General Construction Co.*, 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322 (1926); *Bokum Resources Corp. v. New Mexico Water Quality Control Comm'n*, 93 N.M. 546, 603 P.2d 285 (1979). A penal statute should define the act necessary to constitute an offense with such certainty that a person who violates it must know that his act is criminal when he does it. *State v. Prince*, 52 N.M. 15, 189 P.2d 993 (1948). Adequate notice of what is prohibited must be given. *Hines v. Baker*, 422 F.2d 1002 (10th Cir. 1970).

▪ The Controlled Substances Act gives adequate notice of what is prohibited, and it gives a standard of culpability by which a physician can know he is acting illegally by issuing a prescription not in the course of his professional medical practice. Sections 30–31–20(B) and 30–31–22(A) establish a general prohibition against trafficking or distributing by "any person," except as authorized by the Act. Exceptions authorized by the Act are the administering or dispensing of controlled substances by a physician or according to the physician's lawful prescription. The prescription, as we have stated, must be for a legitimate medical purpose; this requirement, expressed by the C.S.A., is also inherent in the definition of "prescription." A "prescription" is a written direction for "a medicine," Webster's Third New International Dictionary 1792, def. 5a(1) (1971), and "medicine" is "a substance or preparation used in treating disease." Webster's at 1402. Thus, by definition, if the written direction is not for a substance to be used in treating illness, it is not a prescription as that term is used in the C.S.A., and as men of common intelligence understand the term. As the Ninth Circuit Court of Appeals stated regarding the similar federal statute:

> By definition, "dispense" expressly contemplates a "lawful order"; if the order is not such, the prescription is not lawful under 21 U.S.C. § 829 [§ 30–31–18, N.M.S. A.1978 (1980 Repl.Pamph.)]. If the prescription is not lawful, the "practitioner" does not dispense; rather, under § 802(11) [§ 30–31–2(J), N.M.S.A.1978 (1980 Repl. Pamph.)], he "distributes"—that is, he effects delivery "other than by dispensing." In short, a "practitioner" who dispenses does not violate the Act.

*United States v. Black*, 512 F.2d 864 (9th Cir. 1975). The C.S.A. provides a clear, objective standard of culpability; trafficking and distributing are prohibited; delivery which is effected by a physician which is not for a legitimate medical purpose is not excepted from the prohibitions. "When * * * a physician acts without any legitimate medical purpose and beyond the course of professional practice by selling prescriptions that allow the bearer to obtain controlled substances, his conduct should be treated like that of any street-corner pill-pusher." *United States v. Green*, 511 F.2d 1062 (7th Cir. 1975); *see also United States v. Fellman*, 549 F.2d 181 (10th Cir. 1977). Application of the C.S.A. sections to defendant does not violate due process guarantees.

▪ Regarding the trafficking and distribution charges, defendant also claims that

directed verdicts of acquittal should have been entered, and that there is not substantial evidence to support the convictions. Niki Jones, the state's chief witness, testified that she had an agreement with defendant whereby he would write prescriptions for her which she would then sell. She said that on one occasion she gave the doctor $2,000.00 as a one-third split of the money from drug sales. Her testimony alone, without that of others who corroborated elements and testified as to "other wrongs," is sufficient to support the convictions, viewing the evidence in the light most favorable to the state and resolving all conflicts and indulging all permissible inferences in favor of the verdict. *State v. Parker*, 80 N.M. 551, 458 P.2d 803 (Ct.App.1969). We find no error in failing to direct verdicts of acquittal, and the convictions are supported by substantial evidence.

IV. Defendant was convicted of intentionally obtaining diludid and biphetamine contrary to § 30–31–25(A)(3). That subsection in pertinent part reads:

A. It is unlawful for any person:

\* \* \* \* \* \*

(3) to intentionally acquire or obtain, or attempt to acquire or obtain possession of a controlled substance by misrepresentation, fraud, forgery, deception or subterfuge[.]

The statute was applied to defendant on the theory that in writing a prescription for Niki Jones, he misrepresented to the pharmacy that the prescription was for a medical purpose.

■ Defendant argues that application of § 30–31–25(A)(3) to him is an unconstitutional violation of due process guarantees, because the standard of culpability is not sufficiently clear. Defendant's argument is based on two points: (1) there is not fair notice that writing a prescription not for a legitimate medical purpose constitutes misrepresentation or fraud; and (2) there is not fair notice that a person may be held criminally liable for acquiring or obtaining possession of a controlled substance where the substance was not physically returned to his possession after the prescription was filled by a pharmacy.

As we stated previously, the C.S.A. does provide fair notice that effecting delivery through a prescription not for a legitimate medical purpose is prohibited as distribution or trafficking. We thus find no merit to defendant's first allegation of unconstitutionality.

■ We also find no merit to defendant's second point. " 'Possession' may be actual or constructive. See U.J.I.Crim. 36.40. Constructive possession requires no more than knowledge of the narcotic and control over it; control, in turn, requires no more than the power to produce or dispose of the narcotic." *State v. Montoya*, 92 N.M. 734, 594 P.2d 1190 (Ct.App.1979). Application of § 30–31–25(A)(3) to defendant is not unconstitutional, because of the long line of cases holding that constructive possession is sufficient to allow prosecution for possession of a controlled substance. This line of cases begins with *State v. Giddings*, 67 N.M. 87, 352 P.2d 1003 (Ct.App.1970):

After a thorough consideration of the authorities reviewed, we are of the opinion and hold that, in a prosecution for possession of narcotics, it is incumbent upon the state to prove that the defendant had physical or constructive possession of the object or thing possessed, coupled with knowledge of the presence and narcotic character of the object possessed.

Numerous cases since have held that constructive possession is sufficient. *See State v. Maes*, 81 N.M. 550, 469 P.2d 529 (Ct.App. 1970); *State v. Montoya*, 85 N.M. 126, 127, 509 P.2d 893 (Ct.App.1973); *State v. Bauske*, 86 N.M. 484, 525 P.2d 411 (Ct.App. 1974); *State v. Alderete*, 91 N.M. 373, 574 P.2d 592 (Ct.App.1977); *State v. Montoya*, 92 N.M. 734, 594 P.2d 1190 (Ct.App.1979). The fact that the C.S.A. does not specifically state "actual or constructive possession" does not render it void on due process grounds. Particularly in an area such as this, where potentially harmful substances are being regulated, the general rule of law applies: ignorance of the law is not a defense. *State v. Montoya*, 91 N.M. 262, 572

P.2d 1270 (Ct.App.1977), *citing United States v. International Minerals & Chemical Corp.*, 402 U.S. 558, 91 S.Ct. 1697, 29 L.Ed.2d 178 (1971).

 Defendant also contends that the evidence is insufficient to support his convictions under § 30-31-25(A)(3). Proof of possession of a controlled substance may be through circumstantial evidence.

There is no requirement that the proof should be by direct or uncontradicted evidence. Rather, the evidence must be such as discloses some conduct, declarations or actions on the part of the accused from which the fact finder may fairly infer and which is sufficient to satisfy it beyond a reasonable doubt of knowledge in the accused of the presence and nature of the narcotics. Where this has been done the burden has been met.

*State v. Garcia*, 76 N.M. 171, 413 P.2d 210 (1966). In addition to proof of defendant's knowledge of the presence and character of the item possessed, the state must show "the immediate right to exercise dominion and control over the narcotics" to establish constructive possession. *State v. Bauske, supra.* There is substantial evidence in this case on all elements of constructive possession. Defendant himself wrote the prescriptions for the controlled substances, and gave those prescriptions to Niki Jones. The evidence shows that Niki Jones made three trips to sell dilaudid, and shared the money she obtained from one sale with defendant. Jones encountered difficulties on the other two trips; when these difficulties arose, she called defendant to tell him what had happened. This is substantial evidence supporting the convictions. The jury could reasonably infer from this evidence that defendant had knowledge of the presence and character of the substances, and that he had the immediate right to exercise control over them, since Jones reported to him about her trips. It was not error for the court to refuse to enter directed verdicts of acquittal, and the convictions are supported by substantial evidence.

V. The jury returned a verdict of guilty on Count I of the indictment, which charged defendant with conspiring with Niki Jones to commit the felony of intentionally obtaining possession of dilaudid by misrepresentation, fraud, deception or subterfuge, and/or trafficking dilaudid. The jury was instructed that to return a conviction, it had to find that the parties both agreed and intended to commit the crime of intentionally obtaining possession of a controlled substance by misrepresentation, fraud, deception or subterfuge, *or* the crime of trafficking. From the phrasing of these charges and the jury's general verdict, it is impossible to know if the jury found the defendant had conspired to illegally acquire possession of a controlled substance or conspired to traffic.

 Under the C.S.A., as we interpret it, a physician could be charged with either conspiracy to traffic or conspiracy to acquire possession by misrepresentation. Conspiracy is defined as "knowingly combining with another for the purpose of committing a felony * * * *" Section 30-28-2, N.M.S.A.1978 (1980 Cum.Supp). A physician who intended and agreed to act with another to commit a felony could be found guilty of conspiracy. As discussed before, a physician can be charged with crimes under all three sections of the C.S.A.: by writing prescriptions not for a legitimate medical purpose, the physician can be distributing, trafficking, or acquiring possession by misrepresentation, all felonies under the Act. The jury could properly find that defendant conspired with Niki Jones to commit either the felony of trafficking or the felony of acquiring possession by misrepresentation.

 A general verdict of guilty in a criminal case must be set aside where it can be supported on one ground but not on another and it is impossible to tell which ground the jury selected. *Yates v. United States*, 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957). Either ground will support the jury's general verdict in this case, so the verdict stands.

 Defendant also argues that the conspiracy charge should have been dismissed, because under the facts of this case it violates Wharton's Rule. We disagree.

Wharton's Rule provides that an agreement by two persons to commit a particular crime cannot be prosecuted as a conspiracy when the particular crime is of such a nature as to necessarily require the participation of two persons for its commission. 1 R. Anderson, Wharton's Criminal Law and Procedure § 89 (1957). The United States Supreme Court has clarified the nature and application of Wharton's Rule in modern criminal law.

This Court's prior decisions indicate that the broadly formulated Wharton's Rule does not rest on principles of double jeopardy * * * * [Citations omitted.] Instead, it has current vitality only as a judicial presumption, to be applied only in the absence of legislative intent to the contrary. The classic Wharton's Rule offenses—adultery, incest, bigamy, duelling—are crimes that are characterized by the general congruence of the agreement and the completed substantive offense. The parties to the agreement are the only persons who participate in commission of the substantive offense, and the immediate consequences of the crime rest on the parties themselves rather than on society at large. [Citation omitted.] Finally, the agreement that attends the substantive offense does not appear likely to pose the distinct kinds of threats to society that the law of conspiracy seeks to avert. *Iannelli v. United States*, 420 U.S. 770, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975) (footnotes omitted.)

The conduct involved in the conspiracy charge here is not like those offenses to which Wharton's Rule traditionally applies. The harm involved in the substantive offense—trafficking in controlled substances or acquiring possession by misrepresentation—is not restricted to the parties to the agreement. The parties to the agreement to traffic are usually not the only persons who participate in commission of the substantive offense: the controlled substances are passed on, as happened here, to other purchasers. The agreement that attends the substantive offense does seem to pose those threats to society that the law of conspiracy seeks to avert. An agreement to commit trafficking may very well produce agreements to engage in a more general pattern of criminal conduct as the controlled substances are diverted from their legitimate medical uses. Because of these differences between the agreement here and traditional Wharton's Rule offenses, we decline to give significant weight to the Rule's presumption in this case. The district court committed no error in failing to dismiss the conspiracy charge.

■ Defendant also argues that the conspiracy conviction is not supported by substantial evidence. The evidence regarding the conspiracy consisted of testimony of Niki Jones and the prescriptions that defendant wrote. "The coconspirator rule does not apply to the in-court testimony of a conspirator who testifies about his own activities." *State v. Jacobs*, 91 N.M. 445, 575 P.2d 954 (Ct.App.1978). The credibility of that testimony is for the jury to determine. U.J.I.Crim. 40.20, N.M.S.A.1978. There is substantial evidence to support the conspiracy conviction.

VI. Defendant argues that admission of evidence relating to "sex, death, and drugs" was so prejudicial as to deny his rights of due process and a fair trial. Defendant argues that this evidence should have been excluded because "its probative value is substantially outweighed by the danger of unfair prejudice" under N.M.R.Evid. 403.

■ The admission of testimony by Kurt Denis and Gary Jackson is challenged by defendant. The Denis/Jackson testimony was admitted as prior consistent statements under N.M.R.Evid. 801(d)(1)(B). Niki Jones testified on direct examination about her dealings with defendant; on cross examination defendant attempted to impeach her testimony as a fabrication after criminal prosecution had been commenced. Evidence that Jones had made consistent statements in 1977 was relevant, and its probative value in assessing Jones' testimony outweighs its prejudicial impact.

Defendant contends that evidence regarding Mary Gennari and Martha Hamilton was improperly admitted because it was

irrelevant and too highly prejudicial. Evidence Rule 404(b) permits the admission of other wrongs to show, among other things, a defendant's intent and plan. The district court admitted testimony from Michael Sedbrook, Niki Jones, George Boyce, Dr. Derbyshire, Roy Proffitt, J. R. Disher, Dr. Howard Gogel, and Dr. Charles Spaulding about defendant's actions and relationship with Mary Gennari. The district court admitted testimony from Mary Hamilton and Mary Wilson about defendant's actions and relationship with Martha Hamilton. This evidence all related to the circumstances under which defendant prescribed drugs to Gennari and Hamilton, and the jury was instructed to consider the evidence only in determining defendant's intent to act outside the course of his professional practice. The testimony was clearly relevant for that purpose. *State v. Schifani*, 92 N.M. 127, 584 P.2d 174 (Ct.App.1978).

Defendant contends that the prejudice from the Gennari/Hamilton evidence outweighs its usefulness in establishing his intent, and so should have been excluded under Rule 403. When the trial court has applied the balancing test of Rule 403, the appellate issue is whether the trial court's ruling was an abuse of discretion. *State v. Fuson*, 91 N.M. 366, 574 P.2d 290 (Ct.App. 1978); *State v. Schifani, supra.* The probative value of the other wrongs testimony was significant because it tended to show that defendant's actions were not taken for a legitimate medical purpose and thus his intent was to act outside the course of his professional practice. This was particularly important in this case because of the medical issues involved and the deference and respect which would ordinarily be given to a physician's opinion. Because intent must usually be proved circumstantially, the prejudicial impact of this evidence did not outweigh its usefulness. *State v. Libero*, 91 N.M. 780, 581 P.2d 873 (Ct.App.1978). The district court did not abuse its discretion in admitting the testimony of other wrongs.

Defendant claims the district court erred in admitting defendant's medical notes on Gennari into evidence. Evidence Rule 106 states that when a writing is introduced by a party, an adverse party may require the introduction of "any other part of any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." Defendant sought to require introduction of all his notes on Gennari. The purpose of Rule 106 is to permit the introduction of recorded statements that place in context other writings admitted into evidence which, viewed alone, may be misleading. *United States v. Jamar*, 561 F.2d 1103 (4th Cir. 1977). "But this rule is subject to the qualification that only the other parts of the document which are relevant and throw light upon the parts already admitted become competent upon its introduction. There is no rule that either the whole document, or no part of it, is competent." *United States v. Littwin*, 338 F.2d 141 (6th Cir. 1964). The trial court, faced with a practical question regarding the relevancy of all defendant's medical notes, could justifiably weigh the delay and expense involved in admitting them, and thus deny the request. *See* N.M.R.Evid. 102, N.M.S.A.1978. The court did not err in denying defendant's request.

Defendant contends that evidence regarding indictment of another doctor for distribution was so prejudicial as to be reversible error. The state offered this evidence to corroborate Niki Jones' testimony that she had obtained drugs from that doctor; the judge instructed the jury that this testimony did not relate to defendant's guilt or innocence of the acts charged. Because of the judge's admonition, we find no prejudicial error.

VII. Defendant asserts that he was denied due process of law by acts of the Assistant Attorneys General and the Deputy District Attorney before the grand jury. Those persons were properly in the presence of the grand jury as "persons required or entitled to assist the grand jury" under § 31–6–4, N.M.S.A.1978. Defendant does not assert that the attorneys' disagreement resulted from a conflict of interest or because they were acting as partisans, "bent upon obtaining an indictment." *See State*

*v. Hill,* 88 N.M. 216, 539 P.2d 236 (Ct.App. 1975). The mere fact that attorneys disagree in the grand jury's presence, or that defense attorneys would have presented different legal advice to the grand jury, does not invalidate the indictment.

A second contention by defendant is that the indictment charging trafficking or distribution is invalid. Each count of that indictment states that defendant "did intentionally distribute (unlawfully dispense, prescribe, or administer), sell, barter, or give away * * * this done not in the course of professional medical practice or research." Defendant argues that this insertion may have misled the grand jury so that it indicted defendant under an inapplicable statute.

■ We have held that a physician's actions in prescribing or administering drugs must be within the course of his professional practice in order to fall within the Act's exceptions for prescribing and administering. The language which was added to the indictment merely specifies how the state contends defendant trafficked in controlled substances. The trial court did not usurp the Legislature's function in defining crimes and penalties, *State v. Shop Rite Foods, Inc.,* 74 N.M. 55, 390 P.2d 437 (1964); the court was in fact applying the statute as we believe the Legislature intended it to apply. We find no violation of defendant's rights to due process and equal protection in the grand jury indictment. *See State v. Covens,* 83 N.M. 175, 489 P.2d 888 (Ct.App.1971).

VIII. Defendant contends that various actions at trial were prosecutor misconduct which so "inflamed the jury" that defendant was denied due process and a fair trial. We have previously held that the evidence regarding the circumstances under which defendant wrote prescriptions was admissible as tending to show his intent. Most of the questions and statements defendant raises here were part of the questioning regarding that intent.

It is not all misconduct or improper argument that will require granting a new trial or a reversal on appeal. It is

only when such conduct can present a question whether there is reason to believe that it influenced the jury's verdict that the failure to take appropriate steps to remove it will warrant a reversal. *Marks v. United States,* 260 F.2d 377 (10th Cir. 1958), *cert. denied,* 358 U.S. 929, 79 S.Ct. 315, 3 L.Ed.2d 302 (1959). There is no evidence that the prosecutor's action in dismissing the counts involving Marina Schaner was taken in bad faith. Defendant himself could have introduced evidence regarding Marina Schaner, or other evidence, to show his medical judgment as bearing on the question of intent. The remarks which defendant contends were "disparaging and racist" were made on cross examination when Niki Jones said she had "jewed down" the cost of having her teeth capped; defense counsel then stated that defendant is Jewish and Jones apologized. We see no prejudice in this instance because it was defense counsel who first drew attention to the remark and then continued to focus attention on it after the witness had apologized.

■ Finally, defendant contends that the district court failed to exercise proper control over the prosecution's presentation of evidence. We disagree. The district court, faced with a long trial involving many witnesses, made every effort to see that unduly prejudicial evidence was excluded and carefully applied the balancing test of Rule 403 to evidence. The order of proof is a matter of discretion for the trial court, *State v. Armijo,* 90 N.M. 12, 558 P.2d 1151, 1153 (Ct.App.1976), and we find no abuse of that discretion here.

■ IX. Defendant contends there is reversible error in the district court's jury instructions. We find that there was sufficient evidence to support the giving of instructions on Counts I and II, for conspiracy and trafficking in narcotics, based upon the testimony of Niki Jones. Use of the language in U.J.I.Crim. 36.10 is challenged because it does not include the statute's exact terms. Use of that instruction was proper in instructing the jury on the essential elements of the crime, even though the lan-

guage is not exactly the same as in §§ 30–31–20 and 30–31–22. The Use Note to U.J.I.Crim. 36.10 states, "This instruction is to be used for the crime of trafficking by distribution, sale, barter or giving away any controlled substance in Schedule I or II * * * *" The court's instructions on determining defendant's intent to act outside the course of his professional practice were proper. *See Moore, supra.* We find that the jury instructions properly covered all elements of the offenses charged, and non-jurisdictional issues, which defendant raises under Point I, were not objected to at trial to preserve them for appellate review. *See State v. Robinson,* 93 N.M. 340, 600 P.2d 286 (Ct.App.1979). There was no reversible error in the jury instructions.

X. Defendant contends that he was denied due process because the state did not provide him with sufficient information to prepare a defense to Count II of the indictment. The indictment states in Count II "that on or between the 1st day of July, 1977, and the 31st day of August, 1977, in Bernalillo County, New Mexico, the Defendant, Gerson C. Carr, did intentionally traffic * * * *" Niki Jones, the person to whom defendant was charged with giving the drugs, testified that she could not recall the exact date of the occurrence.

■ "It is necessary for an Information to allege such facts as are necessary to give the defendant notice of the crime charged* * * * Every accused has the right to be informed of the crime with which he is charged in sufficient detail to enable him to prepare his defense." *State v. Foster,* 87 N.M. 155, 530 P.2d 949 (Ct. App.1974). The indictment clearly established that the offenses occurred before the return of the indictment and within the statute of limitations. The indictment also states the essential elements of the offense charged—that defendant intentionally distributed approximately 100 pills of dilaudid to Niki Jones. Because the exact date of the offense is not an essential element, we hold that the indictment did state the offense with enough specificity to give defendant notice of the crime charged. *See*

*United States v. Arteaga-Limones,* 529 F.2d 1183 (5th Cir. 1976).

■ XI. Defendant contends that the district court abused its discretion in refusing to grant a new trial, and that cumulative error in the trial denied him due process and a fair trial. We do not agree. The trial court, as we have said, acted fairly and practically in resolving evidentiary issues and in managing the course of this lengthy trial. It was not an abuse of discretion to deny defendant's motion for a new trial. Neither do we agree that there is cumulative error. "We have held that the points raised are not error. Therefore, the doctrine of cumulative error has no application here." *State v. Mireles,* 84 N.M. 146, 500 P.2d 431 (Ct.App.1972).

The judgment of the district court is affirmed.

IT IS SO ORDERED.

ANDREWS, J., concurs.

LOPEZ, J. (dissenting).

LOPEZ, Judge (dissenting).

I respectfully dissent.

I believe the defendant can be tried solely on the charge of conspiracy to traffic, under the Controlled Substances Act §§ 30–31–1 to 30–31–40, N.M.S.A.1978 (Repl.Pam.1980). Because the writing of prescriptions which do not have a legitimate medical purpose is not prohibited in the Act, the application of §§ 30–31–20, 30–31–22, and 30–31–25 to Dr. Carr is unconstitutional. A new trial is required on the conspiracy charge because the verdict is ambiguous and because highly prejudicial evidence was erroneously admitted at trial.

*Constitutionality.*

Much convoluted and intricate reasoning is required to arrive at the conclusion that a physician may be prosecuted for trafficking and distributing under §§ 30–31–20, and 30–31–22(A) N.M.S.A.1978 (Repl.Pam.1980), although I agree that that is what the Legislature did intend. Yet it is not enough for the Legislature to *intend* to make an activity criminal; it must clearly

define that activity. *Hines v. Baker*, 422 F.2d 1002 (10th Cir. 1970); *State v. Prince*, 52 N.M. 15, 189 P.2d 993 (1948). Absent a clear definition of the criminal activity, the statute is unconstitutional. *Connally v. General Construction Co.*, 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322 (1926); *Bokum Resources Corp. v. New Mexico Water Quality Control Commission*, 93 N.M. 546, 603 P.2d 285 (1979).

Both § 30–31–20 and § 30–31–22(A) prohibit unauthorized *distributing* of certain drugs, but neither of them mentions that *dispensing* might in some circumstances also be unauthorized. The writing of prescriptions is clearly dispensing. § 30–31–2(H), N.M.S.A.1978 (Repl.Pam.1980). On the face of §§ 30–31–20 and 30–31–22(A), "dispensing" is not a criminal activity. The federal law, in contrast, specifically includes "dispense" in the list of activities proscribed in the trafficking statute. 21 U.S.C. § 841(a)(1) (1976).

The majority reaches its conclusion that some types of dispensing are criminal by reading the regulations of the board of pharmacy. New Mexico Drug Laws and Board of Pharmacy Regulations, Reg.No. 20 § 913(A)(180), in effect defines "prescription" as an order "issued only for a legitimate medical purpose". This limitation on the meaning of "prescription" is not found in the Controlled Substances Act itself. *See*, § 30–31–2(T) (Repl.Pam.1980). I regard the absence of this limitation as fatal. A penal statute cannot be so vague that men of common intelligence must guess at its meaning. *Connally; Bokum Resources Corp.* Absent any other definition in the Act, a man of common intelligence would think that "prescription" was used in its ordinarily accepted meaning. That is set out in Webster's as "a written direction for the preparation, compounding, and administration of a medicine." Webster's Third New International Dictionary 1792, def. 5a(1), (1961). Under accepted usage, the word "prescription" does not include the idea that it is "issued only for a legitimate medical purpose."

The Legislature cannot delegate authority to an agency to make substantive law. *See, Montoya v. O'Toole*, 94 N.M. 303, 610 P.2d 190 (1980); *State v. Heffernan*, 41 N.M. 219, 67 P.2d 240 (1937). By narrowing the definition of "prescription" to only those prescriptions written for a legitimate medical purpose, the Board of Pharmacy has, in effect, enacted substantive law. At least this is true if the new definition is used to make physicians issuing prescriptions not for a legitimate medical purpose criminally liable for trafficking and distributing under §§ 30–31–20 and 30–31–22(A). Since "distributing" is criminal, while "dispensing" is not, the activities delineated by these two terms must be set out explicitly and clearly in the Controlled Substances Act.

Because the Controlled Substances Act does not give adequate notice to physicians that they are distributing illegally when they issue prescriptions which are not for a legitimate medical purpose, the Act cannot constitutionally be applied to them. Similarly, the Act fails to give adequate notice that a physician who hands out drugs to his patients for other than legitimate medical purposes is distributing rather than dispensing.

Dr. Carr was also convicted under § 30–31–25(A)(3), N.M.S.A.1978 (Repl.Pam.1980) of intentionally obtaining certain drugs by misrepresentation. The conviction was based on the theory that, in writing a prescription to Niki Jones, he misrepresented to the pharmacy that the prescription was for a medical purpose. This statute specifically, and the Act as a whole, fails to give adequate notice that the writing of a prescription by a physician could be misrepresentation.

With respect to the conspiracy conviction, I agree with the majority that a physician could be charged under the Act with conspiracy to traffic, if he is knowingly providing drugs to someone who is trafficking. However, I do not believe he could be charged with conspiracy to commit the felony of acquiring possession of a controlled substance by misrepresentation. The Act

cannot be construed, constitutionally, as making the writing of a prescription a misrepresentation. When there is, as here, technical compliance with §§ 30–31–24 and 25, N.M.S.A.1978 (Repl.Pam.1980), a physician who writes prescriptions cannot be charged with conspiracy to acquire possession by misrepresentation.

Since I believe that Dr. Carr could be charged with conspiracy to traffic, but could not be charged with conspiracy to acquire possession of a controlled substance by misrepresentation, I find that the conspiracy conviction must also be reversed. A conviction cannot stand when it is impossible to tell on what basis the defendant was convicted by the jury, and one of the possible bases was unconstitutional. *Stromberg v. California*, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931). I cannot tell from the wording of the general verdict, the jury instructions, or the indictment, whether the jury found that Dr. Carr conspired to traffic or that he conspired to acquire possession by misrepresentation.

I would remand the case for trial on the charge of conspiracy to traffic. Because the other statutes under which Dr. Carr was charged cannot be applied to him without violating the United States and New Mexico Constitutions, I would reverse his convictions on all other counts.

*Evidence.*

Over objection, the State offered evidence through Kirk Dennis (Kurt Denay) that Niki Jones, the state's principal witness, had told him that she had had oral sex with Dr. Carr in his office in return for drugs. After this witness testified, the state declined to call Niki Jones to ask her about the statement, so she was called by the defense. She testified that she had given a sworn statement to the Assistant Attorney General in which she denied having sex with the doctor. The statement that Niki told Denay she had oral sex with Dr. Carr was admitted as a prior consistent statement, since the defendant had, on cross-examination, challenged Niki's story that she sold drugs for the doctor as a recent fabrication. However, the hearsay statement did not corroborate her testimony about selling drugs. Rather, it added the entirely new element of sex. Further, Niki was not cross-examined about the statement as is required by N.M.R.Evid. 801(d)(1), N.M.S.A.1978, presumably because the State knew she would deny it. The statement was hearsay, was not properly admitted as a prior consistent statement, and was very prejudicial and inflammatory, N.M.R.Evid. §§ 403, 801(d)(1), and 802, N.M.S.A.1978.

The trial court also erred in admitting evidence concerning the sexual activities, drug habits, and deaths of two of Dr. Carr's former patients. This evidence on collateral issues was intended to show prior bad acts of Dr. Carr. Being both highly prejudicial, inflammatory and irrelevant, its admission deprived Dr. Carr of his constitutional right to due process of law and a fair trial. The objectionable evidence concerned Mary Genarri and Martha Hamilton. Several witnesses testified concerning Mary Genarri, her use of drugs and her relationship to the defendant. Roy Profitt testified concerning an incident where he was with Mary Genarri and a couple of others one night when she called Dr. Carr and he came over to the house. She had said she needed some pain killer. She told Roy to stay in the livingroom and she and the defendant went into the den. They closed the door and were in the room for over one and a half hours. After a while Roy Profitt went outside and through a window he saw Dr. Carr lead an apparently dazed Mary Genarri over to the bed where he got on top of her to have intercourse. Afterwards, she appeared stoned. Profitt slapped her and, she told him she and the doctor had had sex. The next day, she tried to commit suicide by slashing her wrists.

George Boyce said that Mary Genarri was his girl friend on and off until right before she died. He testified about Mary's use of drugs. He said that one night the defendant came over to her home and the two of them went in the bedroom for a few minutes. Before the doctor came, she was sick and nervous; afterwards, she was stoned.

George discussed her addiction and how her physical condition had deteriorated. She was beautiful when he met her; later she was sick, thin, and had bruised arms with needle marks; and her bones showed while they made love.

Mary Wilson, Martha Hamilton's sister, testified that she knew Martha Hamilton got her prescriptions, such as Darvon, from Dr. Carr, and talked about Martha's illnesses and behavior before she died, including a suicide attempt. She said that Martha had been in love with the defendant and had had a sexual relationship with him.

Mary Hamilton, Martha Hamilton's aunt, testified about times the defendant had visited Martha at her house. One time in particular, he came with his medicine bag and they went in the bedroom and closed the door. She thought she heard them arguing so she opened the door with her fingernail file. She discovered Martha Hamilton and the defendant making love.

The evidence concerning defendant's patients, Mary Genarri and Martha Hamilton was held admissible under N.M.R.Evid. 404(b) and 403, N.M.S.A.1978, on the issue of intent. Evidence Rule 404(b) reads:

Other crimes, wrongs or acts. Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.

See, State v. Lopez, 85 N.M. 742, 516 P.2d 1125 (Ct.App.1973). After finding evidence to be relevant under rule 404(b), the trial court must balance the prejudice and probative value under Rule 403.

I would conclude that evidence showing that the defendant acted outside the course of medical practice in prescribing narcotics to addicts was relevant. However, the evidence presented was not limited to the area of past prescription of drugs to narcotic addicts. There was abundant evidence of sexual relations that the defendant had with Mary Genarri and Martha Hamilton.

The evidence of sexual relations had no relevance to the showing that Dr. Carr dispensed narcotics outside the course of medical practice to others than Niki Jones. The State also introduced evidence that the two women died, that Genarri's physical condition deteriorated, that her bones showed when making love, and that both women tried to commit suicide. The implication was that defendant was responsible for all of this, although the State could not show that he was. In addition, the evidence was overwhelmingly prejudicial and inflammatory, so that any possible relevance was far outweighed by the prejudicial value under Rule 403.

The purpose of the testimony appears to have been to show the jury that the defendant was a sex maniac and drug dealer who caused the addiction and death of his patients. The purpose of the Rules of Evidence is to insure that the jury bases its verdict on relevant and material facts and not on collateral information which leads the jury to believe the defendant is of bad character and therefore more likely than not to be guilty of the charge at issue. State v. Ross, 88 N.M. 1, 536 P.2d 265 (Ct.App.1975) (evidence that defendant was a prostitute held overly prejudicial). Even where evidence is admissible under Rule 404(b), the prejudice under Rule 403 is affected by the amount of such evidence. Where most of trial time is spent on collateral matters rather than on the matters covered by the indictment, the emphasis at trial becomes distorted, resulting in unfair prejudice and misleading the jury. See, United States v. Jones, 570 F.2d 765 (8th Cir. 1978); United States v. O'Connor, 580 F.2d 38 (2nd Cir. 1978). The evidence on the charges in the indictment was overshadowed by the evidence on the collateral issues.

Admission of the graphic evidence regarding the defendant's sexual relationships with Mary Genarri and Martha Hamilton, the suicidal tendencies and deaths of these women, and the explicit descriptions of the deteriorating physical condition of Mary Genarri was improper. The constitutional

issue aside, the admission of this highly inflammatory, prejudicial and irrelevant evidence was reversible error. At the new trial I would order on conspiracy to traffic, this evidence would not be admitted.